Mr. Leto. May it please the Court. My name is Matthew Leto, and I have the privilege of representing the DiFederico family. This case arises from a terrorist bombing that took place at the Marriott Islamabad in September of 2008. The DiFederico family sued Marriott for wrongful death, survivorship, and vicarious liability that all generally arise from the same allegation that Marriott was negligent when designing a security protocol that was in effect on that evening. This is the second time that this case has been before the Court. On the first occasion, there was a reversal of a dismissal of this action based upon form nonconvenience. In that initial opinion, this Court recognized that the theory that plaintiff was proceeding on was Marriott's control over the security procedures being used by their chizee. After discovery was conducted in this case, the trial court granted summary judgment and found in favor of Marriott and found, quote, Marriott simply did not exert sufficient control over the operations of the hotel to make it responsible for Mr. DiFederico's death. In reaching that opinion, the trial court relied heavily on the franchise agreement in addition to testimony from Alan Orlob, who is Marriott's head of security. And what was wrong with the district court relying on the franchise agreement? That is the agreement between the parties as to how they will interact with each other. That is absolutely correct, Your Honor. Now, the franchise agreement does state that the franchisee is not an agent or a joint venturer or has any other relationship other than a franchisee with Marriott. However, the cases that – It specifically describes the relationship as an independent contractor, correct? That's correct, Your Honor. Now, cases dealing with whether a franchisor is responsible for injuries or damages that occur at the property of a franchisee do look to the franchise agreement. However, the cases do say that that is not a dispositive issue. And what the court should really analyze is the level of control that the franchisor exerts over the franchisee. So what's your best evidence in terms of the level of control that you say Marriott exerted? The level of control is demonstrated through the Marriott standard operating procedures, which are their crisis management plans. Now, the crisis management plan does indicate in its preamble that it is being sent to franchisees as a guide. But then it also goes on to state that certain elements of this plan are minimum standards required for each Marriott property outside the United States, whether operated by Marriott International or by its franchisees. You know, it's interesting, though, but I've seen language exactly like that in franchise agreement, in other franchise agreements, because it's a brand integrity measure. So, for example, if the franchisee falls below a certain standard, then the franchisor withdraws the franchise to protect the integrity of the brand. Is this really any different? Yes, it is, Your Honor. And in all of the cases that really deal with whether a franchisor may be liable for what happens at a franchisee's property, the common theme where the franchisor may be found liable is where the standards imposed are mandatory, and also the standards that create the problem or create the injury are an instrumentality that were actually controlled by the franchisor. Well, help me with this then. It appears to me from the testimony of your own expert that Hashwani alone planned, implemented, and oversaw the security plan. And our expert, John Strauchs, was an expert on the plan itself. He was not hired or retained to testify as to what the record would reflect. But that's not really, you understand that that's not the thrust of my question. And I do, and actually I'd like to address it in the sense of what evidence there was that showed that these were mandatory procedures that were imposed by Marriott on the franchisee. So it's in the management plan itself, it states that the MSOP has to be followed by the franchisees. The crisis management plans are contained within that document, and in particular the crisis management plan that we deemed or we argue is faulty in this case. So when you turn to an August 7, 2007 memorandum that was written by Alan Orlob to all general managers, including franchisees, what they state in that memorandum, and this is record site 1081, is we are presently updating all crisis-related manuals. Please ensure that your local crisis plan is current and reflects the changes that have been made to the international lodging management plan. So what this memorandum does is it imposes upon the franchisee a requirement, and the requirement being to follow the crisis management plan that was indicated in the MSOP. Now, in addition to that, there was a document that was generated by Marriott after the bombing occurred, and in that document the question was identified as to what level of security or what was the building built with terrorism in mind. And in that document, which is an admission by Marriott, they state that when Marriott took it over, we implemented several security measures to meet Marriott's safety standards. Following that, Andy Williams, who is also a Marriott employee, generated an email, and in that email he gives talking points to other members of Marriott. And what he states, quote, is, the fact of franchise, but one area where franchise hotels are contractually obliged to have consistent procedures, is on crisis management and TC, meaning threat condition, security levels. So what they are doing in this case is imposing a level of security on that franchised hotel. It is not a case such as a number of. Back to Mr. Orlob, though. He testified in his deposition, he clarified that Marriott, quote, had no involvement with respect to the security operations at the hotel and that it is a franchised hotel. Doesn't that make all the difference that it's a franchised hotel versus a Marriott managed hotel? It may make a difference if Marriott had not required these procedures to be enacted by the franchisee. Now, I recognize that Mr. Orlob did try to clarify what he stated, but what he was clarifying was his testimony to the Senate committee. And in that testimony, what he says after describing the security measures at the Marriott. Who handled the day-to-day security operations at this hotel? Well, there's no evidence that Marriott was on the ground directing people on a minute-to-minute basis. However, the corporate representative from Marriott did testify that they do have day-to-day control over the threat condition level. When you say testify, do you mean testify in deposition below, or are you referring again to congressional testimony? No, I'm talking about deposition testimony below. It was not Mr. Orlob. His name was Rajiv Menon. Thank you. And he testified that they did exert day-to-day control with respect to threat condition levels. In particular, stating you have, if they provide to the franchisee, you need to change from threat condition blue to yellow, they have to do it within two hours. If you go from yellow to red, you must do it within four hours. Who created the crisis management plan for the Islamabad Hotel? That's a question which, in our interpretation of the MSOP, we will – And who created the crisis management plan? Marriott created the crisis management plan. Now, according to Marriott, there was another crisis management plan created by Hiswani, who's the franchisee. Correct. That crisis management plan, if it exists, has never been introduced into the record at any stage. There is no crisis management plan that has been provided, so the only information that we have as far as a crisis management plan is from the international lodging plan, which then refers to the crisis management plans, which I've discussed previously. Who controlled – Well, did Marriott – could Marriott exercise, for example, any control over employment decisions in Islamabad or policies? Yes. And in the franchise agreement itself, what it states is, is that Hiswani shall employ qualified, as determined by the MSOP, personnel sufficient to staff all the positions. They also require them – Well, that wasn't really my question. Do they exercise any control? The fact that they – let me back up. The problem that I was having when I was reading through is you were citing to a lot of documents, and I would go back to try to track down those documents in the record, and I wouldn't necessarily be able to tell from your references to those documents what documents apply to the franchisees and what documents apply to managed companies. So there was a lot of – there was a lot of confusion generated in my mind by those references. And taking what your position seems to me to be, it's a little hard for me to see what distinction there is between managed hotels and franchisees. If they're all – if, as you would have it, they're all subject to the same standards. And we believe that they are. They are what? Subject to the same standards. And that's exactly my point. So what's the difference? Why is there even a category of franchisee if they're subject to the same standards as managed hotels? Why is there a franchise agreement if they're indistinguishable? Well, in this case, the control that we're referencing, that where there is no distinction is particular when it comes to security, because there is no doubt that Hishwani, as the franchisee, does have control over other aspects of his business. However, and maybe I can help Your Honor out with respect to where the application for security is set forth to the franchisee. And in the record set of 1039, which is the crisis management plan, it's a brand standard, and it states that it applies to managed and franchised property, including the property where the Pakistan Islamabad Marriott was situated. Then it also discusses that the property must have written procedures, and it references the emergency procedures in crisis management plans. So while Hishwani certainly has its ability to manage certain aspects of the business, when it comes to terrorism, security, and crisis management, they do not have that same autonomy. And that is why there can be a franchise, and actually in all the cases dealing with a franchise relationship, it always comes down to the control of the particular instrumentality. And the Bartholomew case out of the District Court of Hawaii, I think really drills down on the emerging consensus that courts seem to have. The crisis management plan that you're talking about was specifically developed by Marriott for managed properties, correct? At JA 625. And the plan was distributed to franchised hotels because the contents of this manual may help the franchised hotels in developing or improving their local crisis management plan. That's correct. Marriott didn't develop this hotel's local crisis management plan, did it? We believe that they did. That's the part at the bottom you keep talking about, the minimum standards that apply to all hotels. And we believe that they, in fact, did develop the plan because also if you look at what happened that night, what we know happened that night is there was no evacuation of the hotel. Whose responsibility was it to develop the local crisis management plan? They have to have a plan. They have to have one. Correct. Okay, I'm sorry. You seem to be going in a direction that I'm not. No, I apologize, Your Honor. We're clear from the agreement that they have to have one. In the agreement, there's no indication, and, in fact, there's a suggestion to the contrary, that it's developed by Marriott. Except subject, I mean, certainly subject to certain minimum standards, as franchisees always are. And they're subject not only to the minimum standards, but, again, going back to what Mr. Williams, what his admission on the record was is they have to have these minimum standards on threat conditioning crisis manual plans. So the plan that was enacted that night is derived directly from the document, which is in the MSOP. Can there be varying degrees of security measures undertaken beyond the minimum that vary from franchisee to franchisee? So, for example, assume that there has to be a minimum standard of security. Do franchisees have discretion to vary above that among the franchisees? I believe that they do, but they would have to receive the authorization from Marriott. And that, if I direct Your Honor's attention back to the August 7th memorandum, which is at 1081 of the record, it talks about exemptions to the crisis management materials that are permitted. But those are granted on an annual basis at states, and those exemptions have to be reviewed and renewed each year. Could I ask you one question before we move on? I mean, before I forget. There seems to be general agreement that Maryland law governs, and I was curious as to why, when, and admittedly conflicts is just a very technical inquiry, but it appeared to me under Maryland law that it was the last site, the site of the injury. And I was wondering why that wouldn't be Pakistani law. And assuming, just assume for a moment that it is, is there any difference? I believe under Maryland law you're correct that Pakistani law would be the operative law because that's where the damage occurred. And to answer the second question, I do not think it would make a difference one way or the other. In fact, both parties did brief the issue of Pakistani law, and that is one thing I believe we did agree on, that if there is a franchisee who's actually a franchisor who committed a wrongful act, well, then they can be held liable for that wrongful act. I don't think there's much of a distinction between Maryland law and Pakistani law. I'm not, I mean, the few cases that I looked at under Pakistani law seem to be even a little more stringent in terms of requiring adherence to franchise agreements than Maryland law did. And, Your Honor, I am out of time. If I may, may I answer that question? And they do appear to have very similar franchise agreements, and they might be more stringent, but the general negligence aspect of it, which both experts did speak about, do find that a franchisor may be held liable if they actually control a particular issue which caused the damage. Thank you very much. Mr. Leary? May it please the Court, Paul Leary for the defendant and appellee. Marriott, Your Honor, you just asked a question, if I could just clarify or touch on that, why Maryland law may apply here. And I think the Court decided it was going to apply here because of the plaintiff's theory, which was that the instrumentality which resulted in Mr. DeFederico's death was a plan that was crafted by someone sitting in a boardroom in Bethesda, Maryland, which was then imposed upon the hotel and mandated that the hotel follow it and cause Mr. DeFederico's death. So it was all about the plan, not what happened in Pakistan. And even though I think the law is a little bit more stringent in Pakistan with respect to exercise of control, I believe that's why ultimately, even with the Lex Loci Doctrine, they did apply Maryland law here. But first and foremost and most importantly, the District Court, after having reviewed the entire record, including all the deposition testimony in this case, determined that there was no Marriott security plan in place that fateful evening. Marriott didn't propose, didn't draft, didn't implement a plan for the security of the hotel or the emergency response. Nor did Marriott hire or train the security personnel and the hotel staff that responded that evening. Marriott didn't buy any of the security equipment, the sophisticated, specialized equipment that contemplated the threat that this hotel faced on a daily basis, given where it was located in Islamabad. Nor did the franchisee need to seek approval for any of the specialized security measures that they put in place. There was no evidence. They haven't presented one. Did they need approval for an exemption? No, no exemptions. So counsel was incorrect when he said that if they wanted to go below a standard in the crisis management, they had to have an exemption from you? There's no exemption request at all. The only thing that matters. No. No, Your Honor. Correct, yeah. Because the only requirement, Your Honor, of the franchisee is that they have their local crisis management plan in place. To the extent they want to do something different, to the extent they want to. Well, what is a crisis, what does that concept come from? It comes from the plaintiffs trying to. No, no, no. I don't mean just the concept in terms of how it relates to that theory of their case. But didn't that come from Marriott, that idea of crisis management? Granted, being there may be international company-owned ones versus franchise. Didn't, wasn't that concept created by Marriott? The international crisis. No, no, no. The crisis management. Right. Yeah, there's the international crisis management plan, which on its face and has testified to everybody from Marriott, was for owned and managed hotels. Right. That is for the hotels that Marriott controls on a daily basis. Right, and this was not one. That's correct. However, you did audit a crisis management plan, didn't you? We audit the hotel and make sure they have their own local crisis management plan in place. Okay, so you did, so you are involved in the local hotel having a crisis management plan, correct? We want to make sure they have a local crisis management plan. That's part of the brand integrity. And is part of that metric what yours is for your own hotels? No. So, in other words, there's no correlation of what yours is, meaning the crisis management plan and the one that you would like or require them to do locally. There's no correlation at all. That's absolutely correct, Your Honor, except for the fact that they do provide recommendations, as Your Honor mentioned, that they provide the plan to let the hotel use as a potential guideline. But it's up to the franchise. In the audit, the audit is merely a check they have one or not in terms of a crisis management plan. It's not any evaluation of what's in the plan, whether it's a good plan, a bad plan. No recommendations are made or anything. Is that what you're saying, just a you have it? Your Honor, that's exactly what Alan Orlov testified and looked counsel in the face. Is that what you do? Correct. You mean to tell me you could do it blindfolded as long as someone points your finger, put a finger on the line, and you could sign it blindfolded? That's all you do? Well, I don't know if the third-party auditor does it blindfolded. I mean, you could, based on what you said. All we got to make sure that somebody says, from a distance, this paper has a crisis management plan on it. You don't need to read it. Just sign it. Is that what you're saying Marriott does, could do? That's what the threat condition audit requires, that they go out and meet with them and their plan. And in this case, one was done two months before the attack, and it was confirmed that they had a plan in place created by the hotel chief security staff contemplating all the dangers that that hotel faced. They put it in place. They don't then go in and say, I don't like this plan. This plan needs to be amended. This plan needs to be adopted and correlated to the international plan for our managed hotels. The franchisees buy their brand. They buy their mark. They are out there to run their hotel. So the plan was in place, but back to your Honor's question, there was no then evaluation of that plan to make sure that it satisfied Marriott's plans. Is the local plan in the record somewhere? No. Is there? The security manual is in the record. I'll talk about it in a moment. But the local plan is not in the record. Is there? So am I understanding you to say that there's no site inspection? No. Well, they meet. They talk with the hotel. They make sure their plan is in place. They go through their various checklist points, which we did produce in this case. And, again, it was done. Did they do this by telephone? I think the testimony was on some hotels they do do it by telephone. What about this one? Islamabad. I don't believe they did an on-site inspection, Your Honor. What kind of discovery was done in this case? Nobody asked you for the local at all? We don't have the local plan. So you don't even have it? No. We don't have it. You don't keep a copy of the one that you get? No, Your Honor. No. They are supposed to have it on site. The hotel was destroyed. No one was ever able to get it. There was no discovery by the plaintiffs seeking to go to the source, which I'd like to touch upon in a minute as a critical part of this case. But there was no plan that was discovered because of the fire. But more importantly, Your Honor, there was no evidence. The fact that Marriott isn't required to have the local plan is, I mean, it's probably a question for opposing counsel, but it seems pretty strong evidence to me that Marriott does not exercise day-to-day control over the security operations of that hotel. Your Honor, you couldn't be more correct. There hasn't been any evidence in this case that Marriott is exercising day-to-day control oversight over the staff. If you think for a moment about the plaintiff's case, they're talking about how people in Pakistan acted pursuant to what Marriott told them to do. Now, the discovery in this case was one-sided because they only deposed the people from Marriott. And as much as they didn't like it, every single person from Marriott said, we don't create a plan for this hotel. We have owned hotels. We have managed hotels. We didn't impose anything. When it came to the other side, you would think the most common sense for this panel to look at and say, what did Marriott do here? Let me hear from the owner. They should be able to tell me. I acted that night. I put those people on the post that night. They responded to this attack pursuant to what Marriott told me. They didn't. As a matter of fact, we produced evidence in this case through our expert where the owner said, this is our hotel. We paid to be the franchisee for this hotel. We run this hotel. We hire our security staff from ex-military. We put in place specialized measures, including this Delta setback barrier gate that saved lives, the communications internally walkie-talkies that saved lives that night. But most importantly, the record is absolutely void of anything, documentation, affidavits, or deposition testimony, suggesting that those people that night, those heroic people, acted because they were trained by Marriott, they were following Marriott's instructions or protocol. It certainly makes me look at Marriott's a lot differently. I mean, I think as I travel now, I'm going to determine whether it's a franchisee or a management-owned. If you're telling me you don't even have a copy, there's no requirement that they even file a copy of the local plane. Right. It has to be on point. Because at the end of the day, Your Honor, we're not criticizing the plan number one. And secondarily, Marriott wouldn't be the appropriate entity to go into a hotel such as the Pakistani hotel, which is in a militarized zone, subject to all sorts of potential terrorist threats, and suggest or impose upon them conditions of which the franchisee by far better knows what they're going to expect and how to run their hotel. And on this case, in this night, this horrific night, Islamic extremists were bent on blowing up this entire hotel. It was known as Pakistan's 9-11. Their goal was they drove through a militarized zone. They wanted to get onto the property, get into the lobby, detonate the vehicle. Their plan was thwarted. But why? Why was it thwarted? Because long before 2008, the franchisee, the Hashwani group, put into place security measures specialized for this property to contemplate car bombs, people coming onto their property. This delta barrier setback gate was in place by the security, wasn't told to marry, wasn't asked for marriage approval. That night, that barrier stopped this vehicle. There were 1,500 people in the hotel that evening celebrating Ramadan. Fifty-six of them unfortunately died. Of those, 30 were the heroic staff, the security personnel, the other personnel that responded to try to save lives. Ninety-nine percent of the people came out that night. What the hotel did that night, measures they had in place, saved lives. When this case started, the plaintiff's theory was about as narrow as it could be because they knew a foreign nonconvenience motion was looming. So they centered this case on one thing, the plan. Plaintiff's counsel stood up before this panel and before the district court several times and said, it's all about the plan. It's not about implementation. It's not about marriage exertion of control in some level. And it's clearly, clearly not about franchise reliability and trying to hold Marriott vicariously liable for the acts of a franchisee. And you're referring to the crisis management plan, the Marriott crisis management plan. The Marriott International Crisis Plan, correct. So their plan was, that was their case. It was all about the plan. And they centered it on this because when they went to the district court, they argued it's about the plan, the plan created in a boardroom in Maryland. Thus, panel, we should be in Maryland. We should be taking discovery in Maryland. That was their winning argument. And they said that that plan was then implemented and imposed. The Fourth Circuit recognized it and said, because of Mr. DeFrancisco's central theory revolves around Marriott's coordination of security from its principal place of business, there is an inherent convenience to bringing the case here. So discovery proceeded. And it became very clear early on from the deposition testimony that every witness advised counsel that we simply don't exert control over the security. And, again, as I said, you would think that you would have heard evidence in this case from the hotel franchisor saying, we did. If we did, we're not here. We're off. We're done. We'll go to trial on it. Or they somehow would have to bring them in. They have no control over it. But Your Honor mentioned the expert report. And I find it interesting because in their briefs at times they tout their expert report because the expert criticizes certain parts of the plan. But at other times they disavow the expert. They don't think the court should consider the expert. Why? Because this expert reviewed every documentation in this case, every deposition in this case. And I questioned him under oath. And unequivocally under oath he confirmed the following. The owner exercises control over all aspects of the hotel, but most importantly, in a damning admission, there was no evidence that Marriott created a security or evacuation plan for the hotel. That was their expert. What site is that in the record? Do you have the JA site? JA 219-15-20 is one site. And I'll quote it, Your Honor. Quote, I'm not aware that the security guards even understood what the international lodging plan was or even that it existed. I would assume they didn't. Also 225, 226. Correct. 240. There's a fair amount of – it was a bit surprising to me, too. Your Honor, it was shocking. The admissions continued to roll off this expert. 220 alone planned, implemented, and oversaw the security plan in place. Right. So for them to now say, well, he was only there to offer criticism on the plan, even if he said the plan was the worst plan ever, he acknowledges there was no plan submitted to the hotel. In addition to his admissions, where you would think there would be some important information about the control of the hotel, what they didn't do, what Marriott produced, was the security manual. The security manual for the Islamabad Hotel, Hishwani Hotels Limited, updated June 2008, shortly before this terrorist attack. The manual makes clear that it was crafted by the franchisee. There isn't one reference in their manual saying this has been created because Marriott imposed information upon us or told us what to do. They recognized the hotel is in the highest danger zone. The security strategy for the plan is very simple. It's written in the plan. Provide multiple layers of security protection to the property. What are the threat scenarios specifically identified in their plan? Suicide bombers, vehicles located with high explosives, or any detonating devices. And what did they do to put measures in place? Here's two of the specific layers in their plan. Manually operated steel pole barriers, heavy duty, remotely operated, high strength road blockers to stop motor vehicles from entering the property. Exactly what happened that night. In addition, they put in place into the plan communication equipment, three types of equipment available for the security staff. Wireless walkie-talkies, fixed telephones to communicate internally to let everyone know what's happening, but more importantly, externally to notify the government, to notify the fire brigade. The evidence is clear. The fire brigade was contacted immediately. The manual concludes by stating that the security of the hotel is in charge explicitly of the hotel chief security officer. The chief security officer will organize drills and exercises to keep his security staff working as one cohesive body to deal with any threat. The security manual here lays down the description for the security that's going to be put in place, but the chief security officer details any plans necessary to account for day-to-day operations. That was the plan that was in place. That was the plan that was being followed that night. If I could for a moment touch upon the plaintiff's theory, which is nothing but a series of progressions of assumptions. They talk about two assumptions. Number one, that because Marriott had a plan for managed hotels that did not call for the sounding of alarms, and because that night they believe that the security staff did not sound an alarm, they must have been following the plan. That is their series of inferences. The case law in the Fourth Circuit is clear. I've cited to the Beale case. A party cannot create an issue of fact through mere speculation or the building of one inference upon another. They have not presented any evidence in this case to suggest by any means that that fateful evening, people were acting pursuant to what Marriott told them, pursuant to what Marriott trained them on, or pursuant to any written guideline. We've said this from the moment this case started. Marriott extends their sympathy towards the families, the lost loved ones, including Mr. DeFederico. It was a horrible, terrible attack. It was Pakistan's 9-11. But Mr. DeFederico did not die that night because someone sitting in a Marriott boardroom, back before this attack, crafted a plan, contemplated security threats over there, put into place that plan, and then imposed it upon the hotel. He died that evening because terrorist attacks were bent on killing everyone in the hotel that night. Thank you very much. All right, thank you. Mr. Lito, you have time reserved. Thank you. I do want to touch on a couple points raised by Mr. Leary. And the first I want to talk about is the audit procedure itself. And the question was posed as to why would Marriott not have this plan in its possession if it actually did have oversight over the hotel. And actually the threat condition compliance instructions that are provided to the third-party auditor do in fact require that the plan be reviewed and the plan language be provided in their audit. So Marriott actually should have had the plan itself. They do review the plan. And, in fact, the auditing procedure in and of itself. It doesn't say that Marriott is required to have a copy of the plan. It says review it and the plan language provided. You could read it over the phone. It says note the plan language. So there is an analysis of the plan language in and of itself as required by these audit procedures. Right. But what Judge Thacker, I think, is saying is it's not required that they have a copy. Oh, no. Maybe I misspoke and I apologize for that. I have not seen anything that requires them to have a copy. However, subsequently, there was a subsequent copy of a plan after this attack took place that was able to be produced by Marriott. So it would be surprising that they would not have this plan, especially when they do regulate it in the way they do with these audit procedures. And going as to why we don't have the plan, well, certainly we don't have the plan because we do not have the ability to contact the franchisee in Pakistan. We do not have the ability to take discovery in Pakistan. On the other hand, Marriott certainly did have the ability to discuss exactly what happened in Pakistan with its franchisee. Nonetheless, they were unable to provide us with the plan that was in effect that night. And what a lot of the Marriott's argument centers on is their expert's apparent interview with the Hishwani employees that I guess were on the ground that night. And they rely heavily on Mr. Gunaratne's interview in proving that Hishwani did not. Who's the expert? Rohan Gunaratne is Marriott's expert. And what they try to prove through his interviews with Hishwani's employees is that Hishwani developed the plan. However, in trying to bring that into the record on summary judgment, that is hearsay and should not have been admitted or considered by Judge Titus. Actually, your expert said the same thing. Our expert was questioned about whether they had control of the property, and those were questions that were characterized or were questioned by Mr. Leary. I'm sorry. I'm not sure why that makes a difference. The difference is when we put him on as an expert, he was retained to actually analyze the plan that was provided to him and tell us from a security standpoint whether that plan was deficient in any way whatsoever or whether the plan was sufficient. That was his expertise. His expertise was not to review the record and then make a factual determination as to whether there was sufficient control from the franchisor over the franchisee. He was not an expert in a franchise relationship. On the other hand, Mr. ---- He wasn't testifying as an expert in the franchise relationship. He was answering questions posed to him about decision-making on behalf of Plaintiff. Those questions were posed by Marriott's counsel, and his expertise was solely to determine whether the plan was sufficient or insufficient on that evening. He was not to determine the ---- I'm not aware that Marriott provided any training. I'm not sure if Marriott had done any training. And it goes on from there. Oh, and the training aspect of it is a separate issue, Your Honor, because the control over and the development of the plan and who developed the plan was not his expertise. His expertise was looking at the plan itself. That was the expertise. So you're saying their examination went over to the point where he would at best be a fact witness, not an expert. That's exactly right, Your Honor. But his testimony is a fact witness. No, but he doesn't have the personal knowledge of what was happening in Ashwani. That's why his testimony should be irrelevant. So going back to Mr. ---- It's your burden, though, to show that, to demonstrate that Marriott actually exercised day-to-day control over the security operations at that hotel. It's your burden. So do you have an expert? Do you have any evidence in that regard other than what ---- I mean, you go back to the congressional ---- other than the congressional testimony. Absolutely. And actually, the standard in reading the cases is not to show that they had day-to-day control as to what every ---- as to what each security officer was doing on each particular day. It's to show that they had control over the subject matter and the instrumentality, which is the imposition of a security plan. That seems to be the standard that's identified in the various cases talking about franchise or liability. And their own admissions, and not just the congressional testimony, but their own admissions through their own e-mails, which discuss ---- May I finish the answer? I do see that I'm out of time. Yes, you may. Thank you, Your Honor. Their own e-mails discuss that they are required, the franchises are required, to have consistent threat condition and crisis manual plans. Thank you very much. Thank you. We'll come down and read counsel and go to our next case.
judges: Roger L. Gregory, Allyson K. Duncan, Stephanie D. Thacker